Good morning, Your Honors. May it please the Court. My name is Tom Hamilton. I represent the appellants in this proceeding who are the descendants and heirs of Margareta Mautner. Mrs. Mautner was a victim of Nazi persecution who fled Berlin, Germany in 1939 and at the age of 76 for sanctuary in South Africa. We are here today because the District Court ruled that even though Mrs. Mautner lost a Van Gogh painting in Nazi Germany as a direct and proximate consequence of Nazi persecution during the late 1930s, her heirs have no legal remedy under either federal or state law to reclaim it. The Court ruled that as a matter of law, there is no federal remedy and the remedy of the heirs to reclaim the painting expired 41 years ago under California law. The District Court's ruling is wrong on both counts. It repudiates a very well-reasoned, circumspect, policy-driven decision by the Intermediate Appellate Court in NASCAR v. American Numismatic Society in favor of some demonstrably flawed and confused dicta that another Intermediate Court in the Baker case lodged in a mere parenthetical footnote. More importantly, perhaps, it repudiates a comprehensive statutory scheme that Congress enacted in 1998 for the expressed purpose of helping Nazi-confiscated artworks and that allocates to the President of the United States $5 million for the express, explicit purpose of helping to secure the restitution of property looted and extorted from victims of Nazi persecution. But before I discuss these two arguments, I would like to underscore two important facts that relate integrally to the rationale of this legislative scheme. The NASCAR decision makes an important distinction between property that is taken initially, involuntarily from its rightful owner, forcefully, where there is no volitional, initial conveyance or transport, and property where a commercial seller will subsidize a conditional sales contract or some owner of property will clothe voluntarily another person with indicia of title and agency. And in the former case, the NASCAR Court says, the policy of California has always been that the statute of limitations does not run until the dispossessed owner of the property taken involuntarily recovers it. The facts that we plead in our second amendment ---- Roberts, Jr. Isn't NASCAR more of a concealment case? Roberts, Jr. Excuse me? Roberts, Jr. Well, as we look at when the statute of limitations starts to accrue, the typical rule is when the plaintiff knew or should have known. It struck me in reading NASCAR that really it was directed toward the case in which the fraud has been concealed or the theft has been concealed. And in that respect, it's not so unusual and I'm not sure it applies necessarily as a unique rule that would apply in this circumstance. And that way you might harmonize that case with the rest of the cases where you have actual knowledge or constructive knowledge. NASCAR, you don't have any knowledge at all because ---- Roberts, Jr. There was a fraudulent concealment in NASCAR. There was. But I think the rule of accrual, the policy-driven rule of accrual that the NASCAR Court discusses in two or three pages there is that there really is an important distinction between this volitional and involitional. The unfortunate lexicon is the word stolen is one of those terms that has no precise meaning. And what the NASCAR Court was trying to say, I mean, stolen can be taken by larceny, by false pretense. What the NASCAR Court was saying is that there are really two paradigms for stolen property. There's one where someone initially entrusts. And they make a big deal in NASCAR about this entrustment, an ostensible agency case or a commercial entrustment, and where the property is taken initially involutionally, either by force or coercive circumstances, where there's not an ---- and there are two totally different paradigms, because in the one instance, the person from whom the property is taken forcefully or involitionally hasn't bargained for anything. They haven't volitionally agreed to tender their property to someone in the consignment or to be ---- participate in a commercial transaction and assume risk of a default. And in that former case where there's involuntary ---- and this is the ruling of NASCAR I propose, Your Honor. It meant more than fraudulent concealment. The doctrine of fraudulent concealment has its own inertia. NASCAR went out of the way to punctuate an implicit rule of accrual in the pre-1983 statute, which the Baker Court didn't disagree with, did not agree with. But it's a policy-driven decision that borrows from the LaBelle case, excuse me, in New York. They cited Sol Monar-Guggenheim Foundation v. LaBelle, a 1991 decision where the New York Court of Appeals, that has the state with the largest art market in this country and a very considered and well-thought-through decision, formulated principles of accrual, which repudiated a constructive discovery rule and basically said the better rule gives the owner relatively greater protection and puts the burden of investigation upon the buyer. So in my opinion, the threshold question was there was a false conflict initially by the district court in framing the NASCAR decision as being, first of all, the parenthetical footnote in Baker, which is pure dicta. We make that point, I think, very emphatically in our brief. The Baker decision had nothing to do with requiring a decision about the content of the pre-1983 statute. It simply observed that had the statute of limitations not been enacted, this claim would not have been saved. But it was, so we don't have to get to that, but we don't agree with the NASCAR court's ruling. There's a second false conflict, which is even probably more acute and it's a little more subtle, and we didn't flag it in our briefs, but I'd like to flag it now. Those four commercial law cases, the so-called conflicting precedent, were decided between 1880 and 1956. They were really antiquated commercial law cases. Their uniform commercial code was enacted in California in 1965. Each one of those cases, however, is very much responsive to the distinction NASCAR made between property that is taken forcefully or involitionally initially and property that is volunteered in a commercial transaction. Each of those cases, three of those cases were conditional sales contracts. The Culp case in 1956 was a conditional sales contract with the sale of jukeboxes. The State Bank case v. Thompson, National State Bank v. Thompson case, the 1943 case, a bank funded a conditional sale of a, quote, gas shovel, which I think is a bulldozer in today's parlance, to a local contractor, assuming contractual risk. The contractor got the property, defaulted immediately on the installment contract. The bank let him keep it. Of course, they want to realize the benefit of the contract, let the contractor keep the shovel. He breaks down. The bank then can monitor and police the collateral. The third case was the San Francisco credit case v. Wells. That, again, commercial sale of a piano, a default on the consignment contract. The piano disappears and is sold at an auction. The credit agency finds the buyer and three years haven't expired, so they can get it back. And then the first case, the Harping case, the 1880 case, a young woman mistakenly lets some man access to her jewelry. He takes it to a pawn shop, pawns it, tells her, you know, some line. A couple years go by. She realizes she's been defrauded, tries to get it back. But more than three years have elapsed since the statute of limitations expired. But even in that case, which is the most felonious of all because there's an initial sort of embezzlement in terms of the false pretenses, under the Uniform Commercial Code today, the same result would accrue. Under Section 2403, commercial law of entrustment makes, in order to encourage commerce, and this is, again, a very important distinction, it's a volitional transaction. So when you go into a commercial context voluntarily, the law does not, you know, impute to you some caution and care. You need to take steps when you consign or entrust something. You take a watch to a jeweler to repair. He sells it. He can convey voidable title to the good-faith purchaser, and it's between you and the good-faith purchaser. You are the one that volunteered physical conveyance of possession of that property to the jeweler, even though there's a larceny there, perhaps. It's not the kind of theft that the NASCA court was trying to underscore, where the property is taken involuntarily, initially, as opposed to volitionally. So at the end of the day on all this, we have to read the tea leaves of the intermediate courts of California and predict what the California Supreme Court would do. Why shouldn't we just certify this issue? It seems to be of some import. It's very much an important question, Your Honor. I don't think there's any conflict at all. And the point I was making, at all in any of the decisional law of California to justify necessarily invoking the distinctive expertise of the California Supreme Court, and the point I wanted to make in response to that is these cases, these antiquated commercial law cases, are 1,000 percent in all fours. And with NASCA, what both teach in a very sort of informed, slightly detached perspective is the lesson of commercial prudence. What NASCA says is that if you go into a market voluntarily and want to buy something, watch out. Why? Because you may be buying stolen property. You may be buying property that was taken involuntarily from someone. And we're not going to dilute the common law rule that a thief can never convey good title to stolen property by allowing somebody in possession of that, whether in good faith or not, to raise a statute of limitations. Well, let's take the NASCA rule as applied to eBay, for example. Wouldn't that bring eBay trading to a halt? No, I'm not sure that ---- I mean, if you're saying that any time that you can't rely on good title because of the ---- Hold on, sir. You can rely on good title. The Uniform Commercial Code ---- Sure. Go ahead. Excuse me. Gives all sorts of, you know, most of these four decisions today, the so-called precedent, would be there are lots of protections in the UCC today to protect someone from, you know, Article 9, secure transactions, financing statements. If you have a superior possessor in lien and property, invoke Article 9 and the world's on constructive notice. And if you ---- and then the buyer's on notice, too. You know, if you don't ---- you can't buy something if there's a ---- in violation of an Article 9 lien. You didn't know that there were Article 9 liens out there. That's too bad. You know, wake up and smell the coffee. If you want to buy something in the market, you need to be aware of what the risks  You can't ---- So Ms. Taylor buys this property in 1963 at a public auction. Yes. It's well advertised. What's the difference? What the difference is, there are enormous red flags in this provenance in 1963 about stolen Holocaust-era property. And these are pleaded comprehensively at paragraphs 17 to 32 of the Second Amended Complaint. And that was the fact I wanted to punctuate that related to the rationale for NAFSA were about not allowing someone in possession of this category of stolen property if forcefully taken to raise the statute of limitations. And the facts are as follows. And it's a notorious ---- judicial decisions that have talked about this have talked about the art market as being a risk. You go into the art market and there's stolen property, you need to exercise precaution. In 1963, Ms. Taylor was an experienced art collector, had been collecting art nearly ten years on the international market. She bought this painting to complement other important paintings. I think she can be held reasonably to a high standard of care. But her father, who acted as her agent in this purchase, was a professional art dealer. His career coincided with the Holocaust, World War II, and the remedial aftermath by which the State Department, both in 1946 and 51, sent to dealers, to art dealers, known art dealers, a letter that said in essentially the following terms, Dear Mr. Taylor, please be advised of two recent historical events, the Holocaust and World War II. Great deal of art was wrongfully taken as a result of both these events and is circulated in the art market. We admonish you to be careful because you cannot get good title to this property, 1946, 1951. Also, the remedial machinery for returning stolen property, Holocaust confiscated property, within the judgment of the U.S. government and the Allies, was still ongoing in 1963. The Berlin Restitution Courts and the German Restitution Courts were still deciding cases under military government law 59 as late as 1966. The provenance at 70s was just an absolute paradigm of red flags, blaring sirens. You had a provenance that had several Jewish owners, as imputed as former owners, with no dates. This is 1963. The State Department says, Watch out. When did they own this property? It doesn't say. This is a 1939 catalog resume entry. And the catalog resume is not just a casual publication. It is an authoritative compilation by a disinterested expert, in this case, Bart De La Faye, who is a renowned Van Gogh authority, who knew. We can demonstrate. It's a historical fact. He knew Mrs. Mautner personally because he thanked her in his 1928 catalog resume, along with other collectors, thanking them for helping him with his catalog resume. And it's a small circle back then of Van Gogh collectors. It's centered around Berlin. Mr. Taylor is an art dealer. This is just a paradigm of a first-year law school. What's negligence per se? Well, take a look at this hypothetical. Now it's considered something else. Excuse me. No, one thing that puzzles me from the record, and it may or may not be important, and certainly is understandable to a certain extent, but there seems to be an absence of evidence of what happened to the painting. How can we presume title in your client? I certainly agree with you. It's sort of outside the formal scope of the appeal. But there is a superabundance of evidence that circumstantially that Mrs. Mautner lost this painting. First of all, we can prove historically that she lost two other paintings as a result of forced sale in Germany, which we've discovered through additional investigation. There are three catalogs resume that place this painting in her possession exclusively. These are judicially admissible treatises and are renowned for their reliability and authoritativeness. But other names are listed on at least some of those catalogs resume. I beg your pardon, sir? Some other names are listed. Other names are listed, but the important point is this. The catalog resume indicate there's a wonderfully poignant discrepancy between the 1970 catalog resume and the provenance that Sotheby's published for this painting. The 1970 catalog resume was compiled by the five leading Van Gogh experts in 1970, commissioned by a Dutch government. These are people that just live and breathe Vincent Van Gogh, and they do things about Vincent Van Gogh that we would find compulsive. Their judgment was that the sale, that the owner between Margaret and Mautner sold the painting directly to Alfred Wolff. They had no indication that there was anyone named Paul Kassir or there's anyone else named Goldschmidt Galleries. And another important fact, a prototypical provenance for a Nazi confiscated painting frequently interjects fictive owners between the victim and the buyer to distance the provenance from any suggestion of Nazi taint. And if we're talking off the record here, we contacted Ernesto Wolff. And I don't know, he was elderly and sick several years ago. I don't know if he's still alive. He told a third inconsistent story about this painting. He told our researcher, when brought to his attention, is this provenance that you indicated Sotheby's right? He said, no, no, no, no. First of all. Breyer. We're off the record now, but I gather what you claim is that if trial were had on this case, that you could prove title. We believe we could. And the other point is this. We don't have a document that says, you know, a bill of sale. But most of these cases don't have bills of sale. And look at the historical circumstances. Why would Mrs. Mautner preserve a bill of sale? She left 1939 Germany without, you know, literally fleeing for her life. She lost her art collection and a lot of other property. Military Government Law 59, enacted in 1947, has a standard of diminished evidentiary need that recognizes that World War II and the Holocaust destroyed a lot of documents, ruined a lot of lives. But we're still going to make restitution here based upon reasonable evidence of ownership as of the time. So I think that the federal government today, with this comprehensive restitutionary scheme necessarily intends to perpetuate and bring forward the sort of remedial structure of Military Government Law 59. If that was true in 1947, all the more strongly is that true today, 60 years later? Well, maybe that brings you to the federal acts. I have considerable trouble with an act that says it's a sense of Congress that governments should do something, because those are words that we usually don't see as imposing a duty on. There's an enormous, yes, Your Honor, enormously more to the statutory scheme than that. It allocates $5 million to the President for the explicit purpose of restitution. Now, that is textual authority. All the textual authority, the contemplation of restitution, contemplates restitutionary proceedings will be had. And that's held for in the trans-American mortgage case very much in that vein. Moreover, and this is vitally important, it makes requirements of disclosure of massive quantities of documents by federal agencies to assist in the restitution of artwork. The federal agencies under the Nazi War Crimes Disclosure Act have to comb through their files, produce all this documentation. It requires the presidential commission went into a dialogue with the American Association of Museums, which are entities with the indirect control of the United States. They're tax-exempt entities that exist by Congress's legislative grace. They agreed with the commission that they would create a website and put information about provenance on. Enormous resources were devoted internationally to a conference held in Washington where 44 nations with initiatives of the State Department to open up new archives. And the point is this, at the end of the day, the strongest argument for an implied remedy are the consequences that would ensue without one. What is Congress doing here? Is it just whistling Dixie with all these requirements? It's not your sense of Congress. That's not the provision from which the claim, the cause of action derives. The completeness of everything else Congress did makes the district court, I think, observed. Why would they just sort of forget to give an implied right of action? They were not forgetting to give what? Expressed right of action. They were asking, I believe, for the help of the Federal judiciary in formulating an appropriate equitable remedy. And here's the point. Usually when they do that, they say. What? Usually when Congress does that, they say so. Well, you know, there are lots of statutory schemes that this Court and other courts have found imply private rights of action with far fewer of the Court v. Asch criteria. I think this is a paradigm for Court v. Asch. I think every single criteria and sub-criteria, the legislate, the people who enacted this thing, just prospectively, dear colleagues, the purpose of this legislation is to help complete the unfinished task of Holocaust art restitution and to underscore and then we're just going to spend $5 million for restitution. But here's my point. Clearly a lot of documents have been made available as a result of this legislation, both nationally and internationally. At great expense, at great effort, at great time, serious amounts of money have been spent for the express purpose of restitution. Holocaust victims are invited to make use of this material. This is a self-help, a self-starter program. There's no other agency or governmental official here that's going to help them carry the ball. They have to decide this is a self-starter program. So it's an invitation. Come forward. Here's the information. Go use it. Put together your claims. And the bottom line is this. At the end of the day, what does Congress intend? That they make use of this information? Clearly. That they've made the information available? Clearly. That they intend to spend money on restitution? Clearly. What happens if the Holocaust victim accepts the invitation, spends their own time, money, energy and resources, opportunity costs to put together a claim and then is told, sorry, you have no remedy here? This is what it is. It's a dirty joke. It is impugning to Congress a cruel intention, a malicious intention. Let's take one last parting shot at these people, you know, before they die, and let's just tell a bit. Let's just really yank their chains around, so to speak, in the vernacular. If we implied a right of action under the Federal law, what statute of limitations would we import? That's an excellent question. And I believe what you have to do to achieve the legislative intent is to invoke the equitable doctrine of laches as the counterbalance to just open-ended liability. And laches, of course, is exactly in equity the statute of limitations. It's informed and animated by public policy considerations. It's informed and animated by the purpose of the legislation and the specific facts and circumstances for each claim. Why wouldn't we analogize to California state law in applying that Federal doctrine to a state suit, a suit founded in California asserting California remedies? You mean California common law? Yes. I think the common law of several states is a distorting prism through which to refract these very important national policies. There is a very, I think, conspicuously clear integrity to this implied right. It's grounded in the remedial legislation, its comprehensive breadth, and its specific requirements. There are specific requirements here. There are real benefits that have been conferred on Holocaust victims here that never existed and now allow claims to be found out and brought. But are you really saying that there is no statute, if there is a Federal right, there's no statute of limitations and we only are guided by the equitable considerations of laches? I believe that's a very adequate resolution that protects the legitimate interest of persons in possession of these materials. That is the remedial scheme that the Court of Appeals of New York has found to be the most appropriate to regulate the New York art market, not just on any stolen art case. There is no statute of limitations in New York under the New York rules of demand and refusal. A cause of action statute. Yes, but do you have a similar Federal statute? I don't think we've ever said that there's a Federal statute that doesn't contain a statute of limitations. Well, you know, the statute of limitations, I think it's within the equitable authority of this Court. And it's a very broad equitable authority, as you know, when a compelling national interest of vital significance is at stake. And there's no other way to achieve that than to exercise the plenary equitable authority of the Court. It's not beyond the scope of authority of this Court to create the appropriate limitation period to protect the legitimate congressional expectations. And I think this colloquy we're having signals why Congress sort of implicitly wanted the Federal judiciary to get involved. This involves some real judicial expertise to consider some questions of accrual, timeliness, countervailing equities, and how this should be done. But clearly, the difficulty of that task should not impede the clear and unequivocal intent that Congress and the President have had in mind and enunciate it in the most  Thank you, counsel. Thank you. Good morning, Your Honor. Steve Reese of Wild Gatcho and Mangy's for the appellee, Elizabeth Taylor. And I'd like to start by taking something out of the case, if I could. The Holocaust was a terrible, unspeakable, many atrocities occurred during the Holocaust, including the looting of a considerable amount of art. This painting was not among them. And just, I think it is obviously not before the Court in terms of what happened to this painting. This is not a summary judgment case. We're hearing a motion to dismiss. But the case is obviously of some public interest, and I think it important for the record to be absolutely categorically clear. After, I don't know how many years it is now, but 40 some odd years after the auction, and after repeated requests by counsel for Ms. Taylor to point to a single fact, a single fact, that indicates that this painting was sold involuntarily. There's no allegation that this painting was taken by the Nazis. We said point to a single fact that shows this painting was sold under duress. And as we stand here, Your Honor, today, there is no such fact. Because as best we can determine, and we did an extraordinary, we did the most thorough investigation that the 60 some odd years that have passed since Ms. Mautner left Germany aloud, to the best we can determine, the evidence is that Ms. Mautner sold this painting in the late 1920s to a Jewish art dealer, who then sold it to another Jewish art dealer, who then sold it to Mr. Wolf, who was a Jewish art collector, who left with the painting from Germany, brought it to his house in Switzerland before 1930. That's as best we can determine. I know it's not relevant, but I think it ought to be clear. Your Honor, let me now ---- I did invite the question earlier. I'm sorry, Your Honor, but I do want to make sure. Now, the legal analysis in this case is actually quite straightforward. There are two questions. One, was Judge Klausner correct in saying the California statute of limitations barred this action? The auction occurred in April 1963 in London. It was publicized to the point of being front page news in both New York and London. There's no question that the sale of the painting to Elizabeth Taylor was open and notorious, and there's no question that she has held the painting publicly, openly, notoriously from 1963 until the present, including as of the time the plaintiffs filed suit in 2004. The painting was on public display at the Metropolitan Museum of Art, attributed to Ms. Taylor in 1986 and 1987. It was the cover of a Christie's auction magazine in 1990, all attributed to Ms. Taylor. The only facts, the only facts upon which plaintiffs base their claim are that Ms. Mautner once had the painting, second, that she left Germany without it, and third, that Ms. Taylor now owns the painting. Those facts were readily ascertainable with absolutely no investigation in 1963. They used the catalog of resume to indicate ownership into the 30s, I believe. I mean, I think that's part of the paper. Interestingly, Judge Canby, the 1939 catalog resume on which they rely by their own admission is incorrect, because their allegation in their complaint is that Ms. Mautner left Germany in 1939 without the painting. The 1939 catalog resume attributes ownership of the painting at that time to Ms. Mautner. So even the catalog resume... But the legal points, the legal analysis for this case is incredibly straightforward and demands the same solution that Judge Klausner found in the court below. It's indisputed that prior to 1983, there was no discovery rule in the California statute. Their entire argument is that the court should infer that prior to 1983, the statute of limitations, in fact, had a discovery rule. There are two basic problems with that, maybe three. One, California law changed. It was amended in 1983 expressly to provide a discovery rule. And the legislative history of that amendment makes clear that the legislature certainly thought there was no discovery rule prior to 1983. They said, we're amending this statute expressly to put in a discovery rule. So at least the legislature that expressly amended the California statute of limitations to provide for a discovery rule after 1983 said it didn't have one prior to 1983. So you're just going head-on against NAFTA, is that right? I'm sorry. I'm just going head-on against NAFTA. Absolutely. Well, NAFTA, I happen to think Judge Thomas is exactly right. You can reconcile NAFTA as, in effect, a concealment case. There were fake coins put in. It is almost like a fraudulent concealment case, and it's almost analogous to the matter where you say the statute runs from the time the concealment was discovered. The second reason why the legislative evidence is compelling that there was no discovery rule prior to 1983 is that California law, and we've heard a lot of arguments about policy and about what Congress should do and about what legislatures should do, the California legislature considered this. They considered all these arguments, and you know what they did? They passed a statute, and they passed a statute that suspended the statute of limitations for people trying to claim Nazi Holocaust art. And you know what they did in that statute? They said, we're going to suspend the statute of limitations with respect to art held by museums and art dealers. They expressly did not suspend the statute of limitations with respect to paintings held by private people. So this has all been dealt with. It has all been considered thoroughly and legislatively by California, and they have made the decision that with respect to art dealers and museums, we're going to suspend the statute of limitations until 2010, but they expressly declined to do it with respect to paintings held by private people like Ms. Taylor. Here's the third point. Even if, despite all that, you could infer that prior to 1983 there was a discovery rule in California, the discovery rule is nothing like the rule that they're advocating for today. Their discovery rule, and the Court ought to be very clear about this, their discovery rule is no matter what the plaintiff does, the plaintiff could sit on its ears, eyes, nose, hands, and feet forever. But if the plaintiff wakes up at any point and says, oh, I may have a claim to that painting, that's when the statute of limitations starts to run. And I will tell the Court, there is no case that says that. In fact, the plaintiffs don't even say that. If you look at paragraph 100 of their complaint, it appears on page 34 of their appendix, they phrase the discovery rule, and frankly, I'll read it because it comes right out of their complaint. Paragraph 100. The discovery rule provides that a cause of action will not accrue until the injured party discovers or by the exercise of reasonable diligence and intelligence under the particular facts and circumstances should have discovered the facts that form the basis of the cause of action. That's their complaint. Under any basis, on any set of reading of the facts in this case, there is no way on earth that they can meet that standard. They did nothing, underline nothing, from 1963 until 2004. They say, well, we didn't really think we had any claims until 1998 when the Holocaust legislation was passed. Well, Judge Canvey, as you pointed out, that legislation does nothing, zero, to create a private right of action. It doesn't even create a cause of action in the government. It creates no cause of action for anybody. There is not a shred, not a shred of evidence that Congress intended to create a private right of action to enforce what rights would be enforced. The statute gives no rights. Plaintiffs say, well, you can make it up. You guys figure it out. Well, the last I looked, the separation of powers is a problem for that, Your Honor. None of those three statutes, and I urge the Court, I'm sure you've looked at them, creates any rights in anyone to do anything, yet alone implies a private right of action. So their argument is the passage of those acts then inspired them to take a look at whether they might have a claim. That was in 1998. Assuming, for the sake of argument, that a private right of action was created, would it be preemptive as to state actions, state clauses of action? Not without an express declaration by Congress to that effect. Judge Thomas, I think you're exactly right. Under federalism, the way it's certainly the way the Supreme Court has looked at federalism, preemption needs to be expressed, and their argument is in hundreds of implied preemptions. You're right, but not where Congress is going to preempt the statutes of limitations in 50 States and create what we've just heard, no statute of limitation. That Congress would simply say, you know, we're going to override the statutes of limitations in 50 States, say there's absolutely no statute of limitation, and you know how we're going to do it? We're not going to say anything. Actually, I was thinking something somewhat different. I was questioning the viability of their state clauses of action if, in fact, there is a federal right of action. Your answer is, if there is a federal right of action, then you don't think it's preemptive of anything. Well, I do not think it could be preemptive of state laws of conversion, which are fairly embedded throughout the States. I think that would be a tough implied preemption argument. I think if there were a federal right of action, frankly, Your Honor, and I don't know what it would be, it would have to sit on top of state rights for conversion. We don't dispute there's potentially a state law of conversion here, and I don't think that their argument is that that's preemptive. I think their argument is that the federal or I'm not sure what their argument is. I think it's that somehow there's a federal overlay on those state rights, and that federal overlay abrogates all state statutes of limitations sub salientio. I think that that's their position. Well, there's another overlay, too, that the district court did not consider, and that's the fact that the sale occurred in England and any conversion occurred necessarily in England. You took the position that English law applied and vested title in your client, right? That's correct, Your Honor, and there was an affidavit, Judge Thomas, in the record that we submitted by Queen's Counsel that said under British law the statute of limitations clearly was expired by 1969, and beyond that, under British law, it's not just that no claims can be brought. Under British law, when the statute expires, title actually vests, it affirmatively vests in the owner of the painting. Judge Klausner didn't find it necessary, and there was no, by the way, there was no contesting affidavit on British law. Judge Klausner just found, look, under California law, which they claim applies, the statute has long since expired. I get that that question isn't before us because the district court didn't rule on it, but it is a rather important issue. Your Honor, I think because if the district court didn't rule on it, and I guess you could say if, in fact, the British statute should have been applied and we were in a situation where we have to go back and, you know, get a judgment to that effect, I think at this point some closure is necessary. And it's necessary, Your Honor, the very procedural history of this case shows why. There was no written demand made for this painting until 2003, I believe. And that is, by the way, the plaintiffs also claim that they couldn't really do anything until after 98 because it took them three years to get counsel until 2001. And they didn't file this complaint until I think it was 2000, October 2004. So, and by the way, October 2004 is six years, more than six years after the passage of the Redress Act, which was passed in February of 1998. But the point was they only filed suit, Your Honor, and I am going to answer your question. They only filed suit in October of 2004 for one reason. That's because Ms. Taylor, having said to them, show me anything, anything, something, some shred of evidence that this painting was for sale and they're not having done that, there was a cloud on the title of this painting. We filed lawsuit, Your Honor. We filed a declaratory judgment in May 2004 saying enough is enough. There's no evidence that this painting was taken, stolen or sold under any improper circumstances. We cannot go on with these allegations clouding the title. We want a declaration. We sued first. That was May 2004. It was only then, five months later, that they filed their lawsuit claiming the painting in November of 2004. We moved to dismiss that lawsuit and this is quite important. In between November 2004 where we made all of these arguments and we said, just as I say to you today, there is not a shred of evidence that this painting was subject to a forced sale. And it's certainly no evidence. They don't even allege that it was taken by the Nazi regime. And that was our argument in May, I'm sorry, November 2004. They filed a response to our motion and an amended complaint in January 2005. There is not a single allegation in that amended complaint where they knew every argument we were making and make here today, there is not a single allegation that provides any more specificity with respect to this painting being taken improperly. And I urge the Court, they list in paragraphs 104 to 106 of their complaint. They list the facts and I believe it's in the record in their appendix of pages 35 to 37. They list the facts they claim they could not discover until they got the assistance of counsel. I urge the Court to look at every one of those facts. Every one of those facts was ascertainable with virtually no work in 1963. There is no reason, if they had a claim, they should have brought it in 1964. Or 1965. Or 1966 when there would have been some hope to actually talk to people who might have some personal knowledge about this painting. But there was 21 years between the time Mrs. Mautner left Germany in 1939 and the sale at which Ms. Taylor bought this painting in 1963. But there are more than 40 years between Ms. Taylor's purchase of that painting in 1963 and their filing of this lawsuit and the only reason they filed this lawsuit is because we sued first to say enough is enough. All of the reasons why statutes of limitations exist are implicated in this case. They're all here in spades. In fact, one can hardly imagine a more dramatic reason why principles of repose and statutes of limitations are in effect. How are we supposed to go back in 2007 to 1930 when we filed this lawsuit? How are we supposed to go back in 2003, 1929, 1928 and explore the specifics of the transfer of this painting? They blithely stand up here and say, well, she had it, she left Germany without it, something bad must have happened. Well, we did a lot more work than that and as best we can determine, with a few witnesses who are still alive from that period, the best we can determine is the painting was sold in the late 20s to a Jewish art dealer who then sold to another Jewish art dealer and the painting left Germany before the Nazis came to power. Should we have a trial about events that occurred in 1928, 29, 30 with the witnesses dead? How are we to do that? And that's why statutes of limitations exist, that's why California, when they looked at this hard and they passed a statute suspending statutes of limitations, didn't suspend it with respect to paintings held by private parties, only with respect to paintings held by museums and art dealers and whatever anyone in this courtroom thinks about the wisdom of those policy choices, they were for the California legislature to make. They are quintessentially not judicial judgments, whether I would reach a different decision, Mr. Hammond would reach a different decision or the court would. California legislature has spoken and the Congress of the United States has spoken, they were subject to all of the emotional appeals, they were subject to intimate details about the atrocities of the Holocaust. If they wanted to create a cause of action, and there was certainly enough political will to do it, this is hardly a case in which there's not a lot of sympathy for Holocaust victims, if Congress wanted to do it, they would have done it and they would have, as Judge Canby said, they would have done it expressly, they would have said this is a terrible thing, we're going to let people sue and we're going to suspend the statute of limitations. They did nothing of the sort. Unless the Court has any further questions. Roberts. Thank you, counsel. I want to make it emphatically clear that this is not pleading, we didn't plead the steps we took as a result of this legislation and the Washington principles to develop our case, but I have an e-mail from our researcher in Vienna about the archives that we went through in order to find out about Alfred Wolff and Margarita Mautner and what was going on in Switzerland and Germany, these archives weren't available until 1995, 2001. So the idea that we could have brought this claim, think about it, Margarita Mautner in Berlin, Germany, this is what the Court said, Mautner knew about the claim. Mautner is an 84-year-old woman at the end of World War II in South Africa, thrown out of her native land, caring for an invalid daughter. The documents, how was she going to go back and prove, you know, where is she going to find Alfred Wolff, hire a lawyer or go off into Argentina, where apparently he was at the time, sue under what law? Military government law 59, the remedial legislation wasn't even in place until 1947, the same year she died. We made use of documents that were responsive to the Federal legislation. This is the whole purpose, let's go out internationally and nationally and make this information available so that people can find out what happened to their stuff and can develop claims. But wasn't this information available in catalogs from Southby's, Christie's, the New York Museum of Art? No, Your Honor. This information we're talking about has to do with records, German, of the Nazi period in Germany. Nazis kept meticulous records of inventories of Jewish citizens, residence records, lots of information about the activities that went on in 1930s Germany. Well, I was speaking of Mrs. Mautner's interest in the history of the painting. Wasn't that available to the plaintiffs many decades ago? Yes, but they're not, I have to understand something. These people, Mrs. Mautner's an art collector. Two points, Mrs. Mautner's an art collector, her grandchildren and great-grandchildren aren't. They just know that grandma used to have some paintings, an art collector. They're not as sophisticated international collectors like Ms. Taylor and her father. It's a false parallel to impute to them the same constructive notice of what a catalog résumé reveals than it is to a professional art dealer who makes his living in this field at this time. So I want to just put to rest any idea that we could have reasonably brought this claim any time earlier. We made use of the documents that were available in Europe as a result of this Washington Principals Initiative to put together, reconstruct the historical events of this period, which is exactly what that initiative was intended to do. This notion that California has somehow restricted, this is the judge's opinion below, restricted rights of action, it has not. That's an erroneous interpretation of the legislation. What that legislation does, it's based upon a moral responsibility to make sure that any artwork in the possession of a California tax-exempt entity that is supported by the public will not be barred under any circumstances whatsoever until 2010. It says whatever the facts, you're going to be able to bring a claim. And as for the argument about, they very much thought it's okay to entertain claims against these tax-exempt entities. We don't have a problem with evidence. We don't have a problem with staleness. We don't have a problem with dead witnesses. Against them, you can bring lawsuits. The statute of limitation contemplates a lawsuit. The legislative history of the statute of this legislation says to the extent that, to the extent that we are extending the statute of limitations, we mean to do it. It doesn't mean that the courts oppose. In other words, we're doing this special thing against these particular defendants? I beg your pardon? I'm not sure I understand. Well, if I understand, your opponent is saying, look, they make a special exception and suspend the statute of limitations with regard to art dealers and museums. And the implication is that they didn't do anything to the statute of limitations otherwise. They basically did this. They basically suspended not only the statute of limitations, but any other law to the contrary, notwithstanding. For example, an argument that you got title under the doctrine of adverse possession in Mozambique would be discarded. Sure, but only as to those entities. But my point is this. It's a special protection for some entities means we were going to let everybody else deal with the judicial principles that the California courts have crafted. Another point that I want to make here, that this is not a discovery rule that Judge Klausner applied below. In this case, the discovery rule of the – in other words, it's a meat cleaver as opposed to a judicial scalpel. If you look at the Baker decision, they illuminate some of the equitable factors that would inform a hypothetical constructive discovery rule if one existed. And it has to do, first of all, it's a fact question. Intensively constructive notice is a fact question to resolve by the prior fact. There's a reasonableness element to all this. Is it reasonable for someone to have done more? And if it's not reasonable to have done more, there's no requirement. It has a frame of reference to a particular group of people that are affected. That is part of the wisdom of Baker and LaBelle. There's not a uniform discovery rule. In fact, in New York, the Court of Appeals of New York dismissed a notion that it's possible to craft a prospective discovery rule that every theft victim would have to discharge to preserve a right to proceed after stolen property. And New York's always been different on their discovery rules than other states. They have been different. They have a distinctive – The New York law doesn't apply here. Well, they have a distinctive law of conversion up there. But they have a – the policy enunciated is the greater – the better rule gives the true owner of property that is forcefully taken relatively greater protection and switches the burden of proof to someone who volunteers a decision to buy something to take precautions. There's a very salutary policy here. It's – every commentator that's looked at the art market has been remarkably impressed by the commercial laxity of this industry. And what that does is it – and there's an excellent law review article I could recommend to the Court if that's too presumptuous. Marilyn Phelan, she's a professor at the University of, I believe, Texas Law School, a renowned authority on tax-exempt organizations, a treatise on museum law, former chair of the International Cultural Property Section, looked at this issue a number of years ago and said, scope of due diligence in obtaining title to works of art, that all the equities favor reasonable investigative precautions by somebody who goes into this market saturated with Nazi artworks, international cultural property that's been looted, stolen artworks. This ask-no-questions protocol is just absolutely – as the court in Porter v. Worth said, a fantasy land, a market in the fine arts. There is not an equitable discovery rule that was applied to this case. We didn't plead a lot of facts because we didn't think the law entitled us to. If the Court decides there's some legal principle here that we haven't properly pleaded, the appropriate disposition is to give us an opportunity to plead facts under Rule 11, responsible and accountable for those facts. But if – in other words, we need to prove that we couldn't have brought this case earlier because of lack of documentation, and I don't think that's the law. I don't think the Court can reasonably impute to California discovery rule – rule of constructive discovery. I think the Nasker decision is a very well-principled, thoughtful decision. The Baker decision does not conflict with it. The earlier commercial precedent does not conflict with it. They are flip sides of the same coin of commercial precaution. Roberts. Thank you, counsel. That's it. The case, just heard, will be submitted and will be in recess. Thank you.
judges: Canby, Thomas, Conlon